ANDREW J. MAST (CSBN 284070)
GABRIEL MARTINEZ (CSBN 275142)
MICHAEL RABKIN (ILRN 6293597)
ALBERT SAMBAT (CSBN 236472)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
Andrew.Mast@usdoj.gov
Telephone: (415) 934-5300

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA | CASE NO. CR 13-00246 CRB |
|---|---|
| v. | **UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. §5K1.1** |
| MOHAMMED REZAIAN, | |
| Defendant. | |

The United States respectfully requests that this Court sentence defendant MOHAMMED REZAIAN to (1) serve a year and a day of custody, (2) serve three years of supervised release, and (3) pay a criminal fine of $10,000, a $200 special assessment, and $110,156 in restitution. This sentencing recommendation is based on the government's motion for a downward departure of 50 percent from the low end of the Guidelines range for substantial assistance and is consistent with the parties' plea agreement.

//

//

# BACKGROUND

Rezaian is charged with participating in the conspiracy in San Francisco County from July 2008 until January 2011 and participating in the conspiracy in San Mateo County from August 2008 until January 2011. Dkt. 1; Presentence Report (PSR) ¶ 14. When Rezaian first began purchasing properties at the foreclosure auctions, he worked with Norman Montalvo, who explained to Rezaian that bidders paid each other not to bid. Rezaian desired to work with Giraudo, Grinsell, Rosenbledt and Cullinane because they were "the best in the business," and over time, Rezaian ingratiated himself Giraudo and the others. PSR ¶ 14. Collectively, this group of bidders (Giraudo, Grinsell, Rosenbledt, Cullinane and Rezaian) were known as the "Big 5," both because of the number of properties they purchased at the auctions, as well as their leadership role in facilitating and enforcing the practice of paying off competitors not to bid against one another on properties at these auctions. PSR ¶ 15.

According to multiple pleading witnesses, Rezaian was considered the enforcer of payoff agreements. He urged others to participate in payoff agreements, and at times, threatened to bid against them if they refused to agree to a payoff agreement. PSR ¶ 16. Rezaian also was the primary record-keeper of payoffs and tracked properties purchased pursuant to payoffs contemporaneously in his BlackBerry. PSR ¶ 16. Rezaian also tracked payoffs in ledgers kept on his computer. PSR ¶ 16.

On April 16, 2013, Mohammed Rezaian was charged by information with two counts of bid rigging and two counts of conspiracy to commit mail fraud in San Mateo and San Francisco Counties. PSR ¶ 1. On May 2, 2013, Rezaian pleaded guilty and began cooperating with the government's investigation. PSR ¶ 2. Once Rezaian pleaded guilty, he became one of the most important cooperating witness for the government. On October 11, 2017, by stipulation, Rezaian withdrew from his original plea agreement and entered a new plea agreement to bid-rigging charges only. PSR ¶ 2.

Rezaian's plea agreement reflects his participation in rigging 98 properties at the San Mateo County foreclosure auctions and 45 properties at the San Francisco County auctions, and a volume of commerce of $24,727,112. PSR ¶ 17. Of the 23 defendants in this case, only

Giraudo, Grinsell, and Rosenbledt have volume of commerce numbers in excess of $24 million. PSR ¶ 17. Moreover, Rezaian's volume of commerce does not account for the 74 bid rigging agreements (in San Francisco and San Mateo) that Rezaian participated in for which he received $110,156 in payoffs not to bid on properties. PSR ¶ 17.

## ARGUMENT

### A. Sentencing Guidelines Calculations

#### 1. Criminal History

In the plea agreement, the parties agree that Rezaian's Criminal History Category is determined by the Court. The PSR calculates Rezaian's Criminal History Category as I based on minimal criminal history. PSR ¶¶ 38-42.

#### 2. Offense Level

The government agrees with the PSR, which calculates the total offense level as 17, consistent with the plea agreement. PSR ¶ 35. This calculation includes a one-level increase to the base offense level of 12 for conduct involving the submission of non-competitive bids, a four-level increase for a volume of commerce exceeding $10 million, a three-level increase for the defendant's role in the offense, and a downward reduction of three levels for acceptance of responsibility. PSR ¶¶ 25-35. U.S. Sentencing Guidelines Manual ("U.S.S.G.") §§2R1.1(b)(1), 2R1.1(b)(2)(A), 3B1.1(b), 3E1.1(a), and 3E1.1(b) (U.S. Sentencing Comm'n 2016).

Under the Sentencing Guidelines, an offense level of 17 and Criminal History Category of I results in a sentence ranging from 24 to 30 months of imprisonment.

#### 3. Fine and Restitution

The PSR calculates a fine range of $247,721 to $1,236,355, consistent with the plea agreement. PSR ¶ 78; U.S.S.G. §2R1.1(c)(1) (fine range shall be from one to five percent of the volume of commerce, but not less than $20,000). In plea agreement, the government agreed to recommend a fine between $10,000 and $100,000. Dkt. 41. This fine range was initially agreed to by the parties in the original plea agreement, based on the application of the fraud Guidelines, and was carried over to the revised plea agreement. In conjunction with its custodial recommendation, the government recommends a $10,000 fine. The government recommends

restitution in the amount of $110,155.70, consistent with the plea agreement. Dkt. 41; *see also* PSR ¶ 20.

**B.     Basis for Role in the Offense Adjustment**

Pursuant to his Plea Agreement, Rezaian agrees that a 3-level enhancement for his role in the offense is warranted. Dkt. 41. Sentencing Guideline Section 3B1.1 provides that if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants," a three-level enhancement should be applied.

Here, the conspiracy plainly involved more than five participants: 23 have pleaded guilty. Moreover, Rezaian's role shows a manager/supervisor enhancement is necessary. First, Rezaian played a role managing other conspirators, including Michael Navone. PSR ¶ 17. Additionally, as a member of the Big 5, Rezaian played a role controlling the auctions by insisting that other bidders participate in the bid-rigging conspiracy. PSR ¶ 17.

However, the four-level enhancement designated for an "organizer or leader of a criminal activity" is not warranted. Although Rezaian played a critical role in the conspiracy, as mentioned above, it was Giraudo who was considered the "King." PSR ¶¶ 8, 17. It was Giraudo who accepted Rezaian as a member of the Big 5 and served as a mentor to Rezaian. PSR ¶ 16. Rezaian deferred to Giraudo. PSR ¶¶ 8, 17.

**C.     Basis for Downward Departure for Substantial Assistance**

Pursuant to Section 5K1.1 of the Guidelines, the government moves for a downward departure for substantial assistance to the investigation. The government recommends a 50 percent reduction from the low end of the Guidelines range of 24 months, resulting in a sentence of twelve months.

The timing, significance, nature, and extent of Rezaian's cooperation warrant a 50 percent reduction. Rezaian entered his plea agreement pre-indictment on May 2, 2013, and immediately began cooperating in the investigation. His plea, and subsequent cooperation, almost certainly influenced the decision of defendants who pleaded after him to also plead guilty and accept responsibility.

//

Additionally, Rezaian assisted the government in gaining access to his BlackBerry ledger notes, and identified additional bid-rigging records on his computer that the government had been unable to access after seizing his BlackBerry and hard drive pursuant to a search warrant. Rezaian also provided five candid interviews with the FBI in which he explained the extensive records of bid rigging on his BlackBerry and computer. During his interviews, Rezaian provided new and corroborating information regarding the operation of the conspiracies and the conduct of other conspirators. Rezaian made himself readily available to the prosecution team and would have been a key trial witness had this case proceeded to trial. In sum, Rezaian was one of the government's most important cooperators and warrants a 50 percent downward departure from the bottom of the Guidelines for his substantial assistance to the investigation.

**D.     Sentencing Recommendation**

The government's recommendation of a year and a day is reasonable and not greater than necessary in light of the factors articulated in 18 U.S.C. § 3553. The Court's sentence must reflect the seriousness of the offense, promote respect for the law, and afford adequate deterrence to future bid-rigging offenses and white-collar crime generally.

Given the magnitude of the financial harm caused by Rezaian's conduct, the government's recommendation, which includes a custodial term, is appropriate and consistent with the commentary in the applicable Guidelines. The commentary makes clear that "prison terms for [Antitrust] offenders should be . . . common" and "alternatives such as community confinement [should] not be used to avoid imprisonment of antitrust offenders." U.S.S.G. §2R1.1, cmt. n. 5 & Background. Given Rezaian's substantial assets, a fine alone—in the absence of a custodial term—would not serve as a just punishment.

Also relevant to the seriousness of Rezaian's offense is the scale of his participation. Rezaian participated in rigging approximately 143 auctions, which is far more than most other participants in the conspiracy. The total bid-rigging payoffs on those properties where Rezaian suppressed competition was over $1 million—money that was divvied up as the fruits of the conspiracy rather than paid to the rightful beneficiaries. This conduct was especially harmful given its opportunistic timing during the foreclosure crisis in the late 2000s, when the integrity of

the financial system was in jeopardy and required governmental intervention. It bred distrust in the auction process and discouraged investors outside of the conspiracy from attending the auctions to purchase foreclosed properties in what is typically a high-demand real estate market. Finally, Rezaian, as a member of the Big 5, carried out his crime on over a hundred occasions at or near the steps of various county courthouses, sometimes when law enforcement was nearby. The government urges the Court to consider the brazen nature of this criminal conduct in imposing an appropriate sentence.

The proposed sentence also takes into account the need for deterrence. The Sentencing Reform Act notes that for white-collar crimes, "the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance." S. Rep. No. 98-225, at 91-92 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3274-75. This is especially true for antirust crimes, which are often hard to detect, taking place in the context of conspiracies that leave few physical clues. In this case, the investigation into the corruption at the foreclosure auctions took years to piece together. The potential for evading law enforcement and the resources required to investigate and prosecute such a conspiracy increases the need for tangible penalties to serve as a deterrent; otherwise, the potential financial upside and low likelihood of getting caught makes engaging in this type of criminal conduct even more enticing. The pervasive nature of this conspiracy also increases the need for deterrence. Dozens of investors thoroughly corrupted the auctions in multiple counties for over two years, recruiting new members, intimidating newcomers, and assuming—as Rezaian likely did—that they would never be held accountable for rampant bid rigging. Sentences commensurate with the Guidelines —based on a conservative measure of the harm caused by this conduct—will send a clear message across the industry that bid rigging is unacceptable.

Probation recommends a dramatic variance from Rezaian's Guidelines calculations that would cut his term of incarceration down to just one third of the low end of the Guidelines range. As discussed above, a variance is not warranted, especially given the magnitude of the financial harm caused by Rezaian's conduct. Rezaian was a principal member of the conspiracy who participated in a high volume of rigged auctions. A year and a day sentence adequately reflects

Rezaian's history and characteristics, including his decision to accept responsibility and his willingness to pay restitution and cooperate in the investigation, while also accounting for the seriousness of the offense and the need to provide adequate deterrence. The recommended sentence also considers the considerable medical issues faced by Rezaian, which the Court should take into account in determining the appropriate sentence. Despite these issues, a custodial sentence is warranted. Rezaian was one of the most culpable members of the bid-rigging conspiracies in San Mateo and San Francisco. A custodial sentence of a year and a day is necessary to account for the seriousness of Rezaian's conduct.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the government's motion for a downward departure of 50 percent from the low end of the Guidelines range for substantial assistance and sentence defendant Mohammed Rezaian to (1) serve a year and a day in custody, (2) serve three years of supervised release, and (3) pay a criminal fine of $10,000, a $200 special assessment, and restitution in the amount of $110,155.70.

Dated: April 19, 2016                                Respectfully submitted,

/s/ ANDREW J. MAST_____
United States Department of Justice
Antitrust Division